(165 P.3d 310)
No. 96,822

In the Matter of the Minor Child REBECCA A. CATHEY.
VIKKI SPENCER and ELLIS SPENCER, *Appellants*, v.
STEVEN E. CATHEY, *Appellee*.

—

Opinion filed August 24, 2007.

*Andrea J. Mengedoth*, of the Hallier Law Firm, of Phoenix, Arizona, and *Elizabeth Hill*, of The Hill Law Firm, P.C., Overland Park, for appellants.

*Melissa Kelly Schroeder*, of The Kelly Law Firm, L.L.C., of Overland Park, for appellee.

Before MALONE, P.J., GREEN and MARQUARDT, JJ.

MARQUARDT, J.: Ellis and Vikki Spencer appeal the trial court's decision regarding visitation with their granddaughter, Rebecca A.

Cathey. We affirm in part, reverse in part, and remand with directions.

Steven E. Cathey and Holli Spencer were married in January 1998. Rebecca was born to the Catheys in November 2001.

The Catheys' marriage was extremely tumultuous. Holli filed protection from abuse petitions in January 2002 and September 2003. Each time Holli filed a protection from abuse petition, she also filed a petition for divorce. A petition for divorce was pending when Holli was killed in a car accident in August 2005.

The record on appeal contains criminal complaints filed against Steven in September and October 2003. Steven violated the protection from abuse orders. He was convicted of violating the order and was placed on 12 months' probation. At least one motion to revoke his probation was filed because he had violated the terms of his probation. The affidavits filed by Holli in support of the protection from abuse petitions stated that Steven threatened to kill her, threw her down the stairs, tried to suffocate her, punched her in the head while nursing Rebecca, choked her until she lost consciousness, and threatened to leave the state with Rebecca. Steven was ordered to participate in anger management counseling.

After each protection from abuse hearing and the divorce filings, Holli and Rebecca lived with Holli's parents, Ellis and Vikki Spencer. This meant that Rebecca lived the majority of the 4 years of her life with the Spencers. Vikki cared for Rebecca during the summers while Holli was working, and helped a great deal with Rebecca's nightly bedtime routine. The Spencers paid for Holli's attorney fees, spent thousands of dollars for Holli and Rebecca's housing and food costs, paid the $5,000 down payment on Holli's home where Steven now lives, and paid a $1,000 judgment against Steven.

Rebecca and Holli had been living with the Spencers when Holli was killed. Even though a divorce was pending at that time, Steven testified that he and Holli were on "great terms." At this same time, Steven had a girlfriend, Katie, who was pregnant with his child. He was planning to marry Katie; however, that is no longer the plan.

Immediately after Holli died, Steven went to the Spencers' home. He allowed Rebecca to stay with the Spencers, stating that he needed to

"make sure that we had—that I had her room ready to go . . . make sure the refrigerator was up-to-date, you know, medicine cabinet, toothbrushes, tooth paste, towels, bedding, I mean everything that she would need to be up there full time. And at the same time I was trying to transition her from being down there to being up here because she had been down there for an amount of time."

According to Steven, he had discussions with the Spencers concerning Rebecca living with him and visitation with the Spencers. Steven stayed with the Spencers in Fort Scott for 12 days during the month of September 2005. Vikki claimed that at that time, they had an agreement with Steven for Rebecca's visitation with them. Vikki testified that Steven proposed the plan and they were "thrilled" and "had not anticipated anything so generous." Vicki testified that Steven was to take Rebecca to Fort Scott for gymnastics through the end of the session on November 29th. They would have nightly phone calls with Rebecca. She would spend 2 or 3 weekends per month with the Spencers from Thursday at 11:30 a.m. when she got out of preschool until Sunday around 6 p.m. She would spend 1 or 2 weeks at a time with the Spencers in the summer, and they would have extended visits when Vikki was out of school for Thanksgiving, Christmas, spring break, and other holidays. She was to spend Halloween in 2005 with them. Steven and Rebecca planned to spend Christmas with the Spencers.

Vikki testified that the plan worked for a couple of weeks, but then the phone calls began to diminish by the week of October 10. Vikki testified:

"He [Steven] had previously said instead of his being down there on the 31st for Halloween, as he had originally intended, he was not going to be doing that, but she could be there for the weekend as planned. And then he called Friday night and said to bring her back Saturday afternoon, which we did. And the next weekend was a weekend she should have been coming to Fort Scott, according to the plan. He called at 9:30 that morning to tell me he had changed his mind and we couldn't pick her up."

Steven testified that the visitation started with "two weekends, because I was working every other Saturday." He stated that "we

had originally discussed, you know, the Halloween, Thanksgiving and Christmas, but life happens. Things changed. The circumstances have changed and so—I mean, what was said didn't end up happening through no fault of anybody."

The Spencers tried to discuss a visitation schedule with Steven to no avail. Steven admits that he refused to talk with them. Steven would not answer the phone when they called. When the Spencers left messages for him to return their calls, he refused to do so. Steven testified that he cut off all communication with the Spencers in November because "she [Rebecca] needs to know where her home is and so I needed to give her and me that time in order to form that bond." Steven allowed Rebecca to telephone her grandparents during this time.

Because Steven had stopped all communication with the Spencers, in early December 2005 the Spencers filed a petition for grandparent visitation. While the motion was pending, the trial court ordered that the Spencers could visit with Rebecca in Steven's Kansas City home on every other Sunday from 1 to 3 p.m., which meant a 170-mile round trip from Fort Scott to Kansas City for a 2-hour visit with Rebecca. They were also allowed visitation from 10 a.m. to 2 p.m. on Christmas Eve, and telephone calls on Sundays and Wednesdays between 5 to 8 p.m., with calls to be initiated by Steven. Ellis testified that Steven allowed the Spencers, cousins, and great grandparents to go to Steven's house to visit with Rebecca for 4 hours on Christmas Eve so long as they brought their own lunch. An order for mediation was entered on February 17, 2006, which was unsuccessful.

At trial, the Spencers proposed visitation for one weekend per month, with "weekend" defined as Friday through Sunday evening, one weekend per month with "weekend" defined as Saturday at 9 a.m. through Sunday at noon, a few "non-consecutive" weeks in the summer, one phone call per week at minimum, and additional time around holidays and Rebecca's birthday if those events did not coincide with a regularly scheduled visit.

At trial, Steven proposed, and the trial court ordered, that the Spencers have unsupervised contact with Rebecca for a period of 7 hours every other month, plus a telephone call between 5 p.m.

and 7 p.m. on Thursdays with the calls initiated by Steven. If the Spencers missed the call for any reason, they forfeited the right to the call. The Spencers were allowed "visitation with the minor child within ten (10) days, for a four (4) hour period, before or after the minor child's birthday and the Christmas, Thanksgiving and Easter holidays so long as that month is not a regularly scheduled month." The order included the following list of restrictions for Rebecca's grandparent visits:

"a. The minor child shall not be asked to call any child or children of Respondent 'step' or 'half' brother(s) or sister(s).

"b. The minor child shall decide what she would like to call any future spouse of Respondent. If she wishes to call her 'Mother, Mommy, Mom, etc.' this shall be supported by the Grandparent Petitioners.

"c. No grooming by Grandparent Petitioners (haircuts, fingernails, toenails, etc.). Only brushing of teeth and hair.

"d. No description of her biological mother's accident or explanation of her biological mother's death. Grandparent Petitioners can only state that: 'Mommy is in heaven' when asked.

"e. No 'heaven parties' or cemetery visits without Respondent's prior written approval.

"f. Grandparent Petitioners shall not take the minor child to any psychiatric, orthodontic or medical appointments of any kind unless they have obtained Respondent's prior written approval.

"g. If Respondent chooses to allow an overnight visitation:

1. Grandparent Petitioners must observe Respondent's routine regarding bedtime, naps, wardrobe, meals, snacks, hydration, and medicine.

2. No baths are to be given by Grandparent Petitioners unless they have obtained Respondent's prior written approval.

3. The minor child shall only sleep alone in her own bed, not her deceased biological mother's bed nor the Grandparent Petitioner's bed.

4. Respondent is to be apprised of the minor child's whereabouts at all times. No outside party visits without Respondent's prior written approval.

5. Each party shall avoid degrading language about the other party and or step-parent in the presence of the child. Neither party shall, by verbal or non-verbal communication, say or do anything that might tend to derogate from the love and respect that the child would otherwise naturally have for the other party."

It should be noted that Steven told Dr. Scott Brown that Rebecca "has a good relationship with his parents and that she regularly spends the night."

On the morning of trial, the parties stipulated that Rebecca has a substantial relationship with her grandparents. The Spencers stated that they would "not attempt to show that [Steven] is unfit." Initially, the Spencers suggested a 2- or 3-day trial so that they could "overcome the burden of saying that father is doing what is in the child's best interest." However, they agreed that the matter could be tried in 1 day after they were asked to post a bond. After hearing testimony and arguments from counsel, the trial judge stated:

"There has been no argument here that Rebecca has a good relationship with you, her grandparents, that relationship should continue. As I said, I don't see any reason why she couldn't spend a week with you folks. But, again, as I said, I don't think that . . . it's not like a divorce case when I at this point decide what is in the best interest.

"Based on the cases I read, it's father's decision. He's the father. He's got to make these decisions. I think he's being a little conservative, but that's not my position to say, well, he's too conservative. I am going to give you more. Even though I think he might be a little bit conservative, I can't say it's totally unreasonable, the position he is taking, and I do think that's the standard here.

"So I am going to grant grandparent visitation in accordance with the father's proposed visitation schedule."

The trial court also ordered the Spencers to pay Steven's attorney fees and expert witness fees, totaling $12,045. The Spencers timely appeal.

On appeal, the Spencers argue that the trial court erred by failing to determine Rebecca's best interests when evaluating the reasonableness of Steven's visitation schedule.

Under K.S.A. 38-129, before granting grandparent visitation, the trial court is required to find that it is in the best interests of the child and that a substantial relationship exists between the child and the grandparents. The burden of proof is upon the grandparents to prove these elements. The trial court must make both of these findings before grandparent visitation may be granted. In addition, a "trial court should presume that a fit parent is acting in the best interests of the child and not substitute its judgment for the parent's, absent a finding of unreasonableness." *In re T.A.*, 30 Kan. App. 2d 30, 35, 38 P.3d 140 (2001).

K.S.A. 38-129(b), the statute dealing with grandparent visitation where the grandparents' child is deceased, states: "The district court may grant the parents of a deceased person visitation rights, or may enforce visitation rights previously granted . . . ."

Because Steven stipulated that he wanted Rebecca to have time with her grandparents, the only issue for us to determine is whether Steven's schedule was reasonable. In so doing, we must determine whether substantial evidence exists to support the trial court's findings. See *Davis v. Heath*, 35 Kan. App. 2d 86, 90-91, 128 P.3d 434 (2006).

Here we have a father who has displayed instability and bad judgment at his best. He was not a part of Rebecca's life for a majority of her life. Because of his abusive actions, Steven did not see Rebecca at all for a period of at least 7 months. Steven has a history of nothing but very short-term employment. He is currently unemployed and collecting unemployment benefits. Steven lost his job at Home Depot when a background check revealed that he had two misdemeanor convictions in his criminal record. Steven severely abused his wife and has violent traits. There is no evidence in the record on appeal that he ever paid any support for Holli and/or Rebecca during their separations when Holli and Rebecca lived with the Spencers.

On the other hand, we have grandparents who were with Rebecca daily for most of her life. Vikki has been an educator for 31 years and has been teaching at a university for 17 years. Ellis has been in finance for 35 years and has been in his current job for 24 years. The Spencers have been married for almost 35 years. Holli was the Spencers' only daughter, and Rebecca is their only grandchild. When Rebecca and Holli lived with the Spencers, Rebecca attended daycare and preschool in Fort Scott for 1½ years; the Spencers took Rebecca to the pool, the county fair, and the park; they played golf with her; read 6 to 8 books each night; and "shared equally in everything that happened from meals to grooming to play time to everything that occurred."

The Spencers argue that the trial court erred by finding Steven's proposed visitation schedule was reasonable. They note that "reasonableness" as a concept has not yet been defined by the Kansas

appellate courts. They urge us to use a totality of the circumstances analysis. Given the facts and circumstances of this case, the Spencers argue that Steven's proposed schedule would not allow Rebecca to maintain her "substantial relationship" with them.

At the trial, Dr. Christine Hillila testified on behalf of the Spencers. She believed that Rebecca was very attached to her grandparents. Dr. Hillila had counseled Rebecca in the context of the divorce filing 2 years before this proceeding but had not seen her since. However, Dr. Hillila stated that restricting Rebecca's access to her grandparents could be seen as "another kind of loss," given the loss of Holli and all of the transitions Rebecca went through during her parents' volatile marriage.

Dr. Brown, Steven's expert witness, spent approximately 13 hours evaluating Steven and Rebecca. Dr. Brown was asked to determine: (1) Is Steven mentally ill? (2) Can Steven be an effective parent? (3) Is there reason to be concerned about the violent incidents in Steven's past? Dr. Brown found that Steven was able to set limits, enforce rules, and show love. However, Dr. Brown reported that on the "At Risk for Violence Stress Handling Questionnaire," Steven was elevated on four of the subscales at "High or greater levels . . . . This suggests that he shares these traits with those who are violent. In addition, Mr. Cathey's **Total** Score is elevated."

The trial court essentially made no decision on what was reasonable or unreasonable; the trial judge merely stated: "I think my role is to determine what if the father's decision is just totally unreasonable." The trial judge's decision is incongruous with his statement of "I don't see any reason why she couldn't spend a week with you folks [grandparents]. . . . I think he's being a little conservative." In fact, the trial judge hinted that Steven's visitation plan was unreasonable, stating:

"I can sit here and tell you what I think is reasonable and, you know, for grandparents to live an hour and a half or so away, you know, it might include things like having the [grand]daughter down for Sunday visits sometimes, maybe even overnight visits on a Saturday night through a Sunday on certain occasions. You know, depending on how busy she is, how often would that be, well, I don't know how often that would be, maybe it might be once a month or it might be

some other schedule. Here, she was living with you for a good part of her life so she certainly would expect to be comfortable there, used to staying with her grandparents.

"It's not uncommon for grandkids to go to the grandparents' house and stay for a weekend or . . . the grandparents have a farm or something and they go there and spend the week with them in the summer. And we have had families in here where it was just a regular deal, the kids went and stayed with the grandparents . . . on the farm for a week every summer. Certainly that wouldn't be unreasonable in a situation like this."

Research on this issue has revealed no case in which the Kansas appellate courts have held that a parent's grandparent visitation plan must be *totally unreasonable* before it can be rejected. Moreover, a *totally unreasonable* standard should not be adopted or endorsed by this court.

The question cannot be, "Is the proposal totally unreasonable?" The question must be, "Is father's proposal reasonable under these circumstances?" Rebecca lived with the Spencers for 2 years. We would have a different situation if Rebecca had been living with Steven, if Steven had a stable relationship with Holli, and if he had made wise judgments in the past. Merely declaring that Steven is "fit" does not resolve the issue of the reasonableness of his proposed visitation schedule. When deciding the reasonableness of visitation with a child's grandparents whose daughter is deceased, the trial court must consider the totality of the circumstances and determine what is in the best interests of the child and whether there is a substantial relationship between the child and the grandparents. It does not appear that the trial court ever considered all of the circumstances when it granted visitation according to Steven's schedule.

Under Steven's rules, if there were a medical emergency during the Spencers' visitation with Rebecca, they could not even take her to a doctor. They are restricted from giving baths, something they had been doing for years. Under these circumstances, it is not in Rebecca's best interests to keep her away from the family with whom she has had daily contact for a majority of her life. Steven's visitation schedule is causing Rebecca another loss in her very young life. The restrictions Steven has imposed make the trial court's order totally unreasonable. The trial court's decision is re-

versed, and the case is remanded to a different judge with directions consistent with this opinion.

A decision on the issue of costs and fees will be dealt with separately.

Affirmed in part, reversed in part, and remanded with directions.

GREEN, J., concurring: I concur with the majority opinion to reverse the trial court's judgment adopting the father's grandparent visitation plan. Nevertheless, I write separately because Judge Marquardt, who was assigned to write the opinion in this case, cannot agree with the majority opinion affirming the trial court's award of costs and fees to the father.

"Generally, an award of attorney fees rests within the sound discretion of the trial court, and its determination will not be disturbed on appeal in the absence of an abuse of discretion." *DeGraeve v. Holm,* 30 Kan. App. 2d 865, 869, 50 P.3d 509 (2002) (citing *York v. InTrust Bank, N.A.,* 265 Kan. 271, 307, 962 P.2d 405 [1998]).

The payment of costs and attorney fees in grandparent visitation actions is governed by K.S.A. 38-131. K.S.A. 38-131 states: "Costs and reasonable attorney fees shall be awarded to the respondent in an action filed pursuant to K.S.A. 38-129 *et seq.* unless the court determines that justice and equity otherwise require." The legislature clearly intended that the petitioner (grandparents) pay the costs and the attorney fees unless the trial court specifically finds that justice and equity require otherwise. *Spradling v. Harris,* 13 Kan. App. 2d 595, 602-03, 778 P.2d 365, *rev. denied* 245 Kan. 786 (1989).

The use of the word "shall" in K.S.A. 38-131 suggests that the trial court has an obligation to award costs and attorney fees in the absence of circumstances which would require that each party bear its own costs. Here, the trial court determined that the grandparents should pay the father's costs and fees. In making the award of costs and fees, the trial court looked at each party's financial position. The trial court determined that the grandparents' financial position was "much better" than the father's financial position. The trial court also noted that equity was in favor of the father because he defended himself from the action brought by the grandparents.

The grandparents' arguments in favor of waiving costs and fees are easily countered by examples of how they drove up the costs of litigation. They wanted a 2- or 3-day trial and only agreed to a shorter proceeding after a trial bond was proposed. The grandparents refused to stipulate to the father's fitness to parent until the morning of the hearing. On the other hand, the father stipulated that he wanted Rebecca to have visits with her grandparents.

In explaining that an appellate court does not review the merits of the decision of a trial court but, instead, the way a trial court made it, our Supreme Court stated:

"In general, when a discretionary decision is made 'within the legal standards and takes the proper factors into account in the proper way, the [trial court's] decision is protected even if not wise.' [Citation omitted.] However, '[a]buse is found when the trial court has gone outside the framework of legal standards or statutory limitations, or when it fails to properly consider the factors on that issue given by the higher courts to guide the discretionary determination.' [Citations omitted.]" *Dragon v. Vanguard Industries, Inc.,* 277 Kan. 776, 779, 89 P.3d 908 (2004).

Here, the trial court stayed within the framework of the legal standards placed upon it by K.S.A. 38-131. In arriving at its decision, the trial court considered the necessary factors of K.S.A. 38-131 in applying its discretion.

Because the trial court exercised its discretion within its authority and according to the evidence, its decision is protected even if an appellate court disagrees with it. As a result, we determine that the trial court properly awarded costs and fees to the father in accordance with K.S.A. 38-131.

MALONE, J., concurring: I respectfully concur with the majority to reverse and remand the trial court's judgment on grandparent visitation, but only because of the "grandparent visitation rules" included in the permanent grandparent visitation plan. I find the rules to be unnecessary, and in some instances unsafe, and I conclude the trial court abused its discretion in adopting the rules as the order of the court.

As for the award of costs and attorney fees, I concur with the result of Judge Green's separate opinion. K.S.A. 38-131 requires costs and reasonable attorney fees to be awarded to the respondent

on a motion for grandparent visitation, even when the grandparents prevail on the motion, unless the court determines that justice and equity otherwise require. Here, the trial court did not abuse its discretion in awarding costs and attorney fees to the respondent.

MARQUARDT, J., dissenting in part: I respectfully dissent from the majority on the issue of costs and attorney fees.

The Spencers claim that Steven should have to pay his own costs and attorney fees. I agree.

The payment of costs and attorney fees in grandparent visitation actions is governed by K.S.A. 38-131. The interpretation of a statute is a question of law over which this court has unlimited review. An appellate court is not bound by the trial court's interpretation. *State v. Maass,* 275 Kan. 328, 330, 64 P.3d 382 (2003).

K.S.A. 38-131 reads: "Costs and reasonable attorney fees shall be awarded to the respondent in an action filed pursuant to K.S.A. 38-129 *et seq.* unless the court determines that justice and equity otherwise require."

In the case at bar, the trial judge stated:

"One of the factors we consider in justice and equity is the—I think you consider who the prevailing party is and the Court would find that he has prevailed here today. Then we can look at other things that have been brought up about—I think probably the most significant factor is maybe the parties' financial position."

Here, the trial court considered that Steven was the prevailing party when awarding costs and attorney fees. Our decision on the issue of grandparent visitation is reversed, and that negates the trial court's "prevailing party" analysis. The majority claim that the grandparents "drove up the costs of litigation" by requesting a 2- or 3-day trial and not stipulating to Steven's fitness until the day of trial. They are ignoring the fact that this litigation would not have been necessary in the first place if Steven had talked with the Spencers about visitation.

Steven was the one who abruptly terminated all visitation with Rebecca within 1 month after he agreed with the Spencers on a visitation schedule. Steven refused to answer the Spencers' phone calls and refused to return their calls. The Spencers had no choice but to hire counsel to get visitation with Rebecca. Also, the trial

court literally forced the Spencers into agreeing to a 1-day trial by asking them to post a bond. Steven was never asked to post a bond.

The majority also fault the Spencers for not agreeing that Steven was a fit parent until the day of trial. It ignores all the horrible physical abuse Holli suffered at Steven's hands. The Spencers' hesitancy on the issue of his fitness is very understandable. His own expert witness at trial testified that "he shares these traits with those who are violent." Steven's score was elevated on the "At Risk for Violence" assessment.

Generally, an award of attorney fees rests within the sound discretion of the trial court. In grandparent visitation cases, where the trial court made no findings on the issue of justice and equity, petitioner must pay respondent's attorney fees. *DeGraeve v. Holm*, 30 Kan. App. 2d 865, 869, 50 P.3d 509 (2002).

The trial court's decision on costs and attorney fees does not make sense when Steven was the one who stopped all communication with the Spencers about visitation. By awarding Steven costs and attorney fees, the court is rewarding him for his outrageous denial of visitation and the totally unreasonable visitation that was ordered.

The trial court stated that the Spencers were in a better financial position than Steven to pay costs and attorney fees, but that should not be the criteria for ordering the payment of costs and attorney fees. They should be ordered on the basis of justice and equity.

Steven had no problem allowing the Spencers to pay all expenses for Holli and Rebecca when they were living with them for almost 30 months of Rebecca's 48-month life. Steven has benefitted financially from Holli's death. He received the insurance proceeds from Holli's accident on a car that the Spencers had bought. Steven is living in the house on which the Spencers paid the $5,000 down payment. The Spencers paid an outstanding judgment of $1,000 against Steven. Steven now has a vehicle, a $25,000 money market account, proceeds of Holli's life insurance policy, Holli's KPERS account, and two claims for $60,000 which he said would go to pay for Rebecca's care. Steven has the funds to pay his own litigation costs.

Justice and equity require that Steven pay his own costs and attorney fees. The trial court's award of costs and attorney fees to Steven should be reversed.