NOT DESIGNATED FOR PUBLICATION

No. 121,479

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Marriage of

JARED MICHAEL BERRY,
*Appellee*,

and

SUSAN MICHELE BERRY,
*Respondent*,
(MICHAEL BERRY,
*Appellant*).

MEMORANDUM OPINION

Appeal from Sedgwick District Court, SEAN M.A. HATFIELD, judge. Opinion filed June 19, 2020. Affirmed in part, reversed in part, and remanded with directions.

*Tony A. Potter*, of Ward Potter LLC, of Wichita, for appellant.

No appearance by appellee.

Before POWELL, P.J., GARDNER, J., and WALKER, S.J.

POWELL, J.:  When Jared Berry cut off his father's contact with his adopted son Noah, Jared's father moved to establish grandparent visitation rights under K.S.A. 2019 Supp. 23-3301. After hearing evidence, the district court declined to order visitation and ordered Jared's father to pay Jared's attorney fees. Jared's father, Michael Berry, now appeals, raising two issues. First, he argues the district court erred by not ordering grandparent visitation. We agree because Jared took the view at trial that supervised visits

1

between Noah and Michael in a therapeutic setting was in Noah's best interests. Second, Michael claims the district court should have awarded him attorney fees. But we are unpersuaded because a reasonable person could agree with the district court's decision to award attorney fees to Jared instead. Accordingly, we affirm in part, reverse in part, and remand for further proceedings.

FACTUAL AND PROCEDURAL BACKGROUND

*Marriage and divorce*

Jared and Susan Berry married in Wichita, Kansas, in 2006. A year later, they adopted Noah with help from Michael and his wife, Nancy. Nancy is Noah's biological aunt (her brother is Noah's biological father). Born in 2006, Noah has bipolar disorder one and attention deficit hyperactivity disorder; he takes medications for both. Noah also has oppositional defiance disorder.

A few months after Susan moved to Oregon in December 2014, Jared filed for divorce. The district court granted the parties a divorce and awarded Jared sole custody of Noah in August 2015. Since then, Noah has had no contact with Susan other than some letters she sends him; she sent the last letter around April 2018.

Michael and Nancy remained involved in Noah's life after the divorce. They often had him over for dinners and sometimes for overnight visits, and they took him on vacations and spent holidays together. Besides Jared, they have been the most important people in Noah's life.

*Visitation ends, litigation begins*

Upset that Jared had spanked Noah in June 2017 and left a mark, Michael for several months told Jared to stop spanking Noah and to go to counseling. According to Jared, Michael said he would report Jared to child services if Jared did not do those things. Jared said he rarely spanked Noah and never spanked him again after the June spanking. The dispute over the spanking caused Jared to end Michael and Nancy's contact with Noah in November 2017. Around that time, the Kansas Department for Children and Families (DCF) received a report that Jared had abused Noah by spanking him; Jared suspected Michael filed the report. DCF found the report was unsubstantiated.

In February 2018, Michael and Nancy intervened in Jared and Susan's divorce proceeding to establish visitation rights with Noah. Because Jared could not pay the required fee for court-ordered mediation, he met Michael and Nancy at a restaurant to discuss visitation. The parties reached an oral agreement, and visitation resumed for the first time since November. Michael and Jared later met at the restaurant again to resolve Jared's concerns with language in a written version of their agreement prepared by Michael and Nancy's attorney. Jared wanted to ensure that Michael and Nancy never discussed Susan with Noah, monitored his internet use, and monitored his exposure to violent TV shows and video games. After Jared's changes were included, he still would not sign because he felt Michael and Nancy were not following the agreement.

Around this time, Jared's attorney moved to dismiss Nancy from the case because she was a step-grandparent, not a grandparent as is required under K.S.A. 23-3301(a) to establish visitation rights. The district court agreed and dismissed her from the case.

*Limited case management*

The district court sent the case to limited case management with Kim Kadel, paid for by Michael. After two sessions with Kadel, the parties reached a verbal visitation agreement in August 2018. When Kadel sent the parties a written agreement memorializing their verbal understanding, only Michael signed. Kadel said Jared objected to a provision granting Friday overnight visits and still had concerns about Noah's exposure to violent TV shows and video games. Kadel thought the written agreement already addressed those concerns. Jared said he did not sign because he misunderstood some language in the agreement.

The parties had another session with Kadel in early October and reached a second oral agreement. The written draft of the second agreement incorporated Jared's concerns, but Kadel thought it was substantially the same as the first. Kadel sent out the new agreement; again, only Michael signed. After addressing Jared's concerns with the second draft agreement, Kadel sent out a third draft on October 25. Jared did not sign it because he felt Michael and Nancy were violating its terms by, for example, allowing Noah to use electronic devices unsupervised. The parties had addressed these concerns, in Kadel's view, before she sent out each draft.

Because the parties had failed to reach a visitation agreement, Kadel submitted her recommendations to the district court in a December 2018 report. Kadel thought her report mirrored the parties' August visitation agreement, and the report took the view that Michael and Nancy had a substantial relationship with Noah and visitation was in his best interest.

*Temporary visitation problems*

On January 28, 2019, the district court temporarily ordered the parties to follow the recommendations contained in Kadel's report. At the time, the parties had been following some version of Kadel's recommendations since October. During that time, Michael and Nancy had two weekend visits with Noah each month—a "short weekend" from Friday night to Saturday afternoon and a "long weekend" from Friday night to Sunday evening. They also had some weeknight overnight visits.

Jared thought these visits had been going well. Michael agreed but noted Noah had been having anger outbursts in which he would curse, shadow box, and make threats before calming down. The outbursts were nothing new but had escalated in 2019. Noah's attitude towards Michael and Nancy had also hardened.

A few days after the district court's temporary visitation order, Noah had an outburst during a weeknight visit. Noah was upset because his grandparents shut off the internet and asked him to go shower. During the 30- or 45-minute argument that ensued, Michael tried to calm Noah several times. The discussion eventually migrated to the bathroom, where Noah stood between Nancy and the bathroom door, cursing and swinging at her. Michael ended the heated exchange by cooling off Noah: he "moved him about 18 inches into the walk-in shower and hosed him off just to disrupt his thinking."

On February 1, Jared reported Michael to DCF for abuse based on the shower incident. DCF found the report was unsubstantiated. Jared said he took pictures of a bruise on Noah's bicep and a red mark under his eye from the incident, but he did not provide the photos in discovery.

Visitation was sporadic between February and April 2019. No visitation occurred in February because Noah would not go, and Jared was concerned about Noah's safety and his increasingly physical behavior at his grandparents' house. Later that month, Michael moved to hold Jared in contempt for not following the temporary visitation order. The district court decided to defer the contempt issue until trial. Some visitation occurred in March and April, including short- and long-weekend visits. Michael said these visits were harder than usual; Noah's outbursts were getting worse and he was becoming more violent.

During an early April visit, Noah had another outburst. Noah's two cousins, ages seven and ten, were also visiting at the time. Noah grabbed Michael by the throat while he sat in a recliner chair. Michael moved Noah's hand away and took Noah outside on the back porch to calm down. Noah smashed the porch screen door and a glass window with a plastic baseball bat, cutting himself. Michael stopped Noah's bleeding with a towel and cleaned his wound. Jared reported Michael to DCF for emotional abuse based on this incident. DCF found the report was unsubstantiated.

Visitation stopped again after the window incident. When Michael asked why, Jared said he was concerned for Noah's safety and Noah did not want to go. Michael kept insisting to see Noah, which Jared felt only upset Noah more.

*The bench trial*

On May 23, 2019, four witnesses testified at the bench trial on Michael's visitation motion: Kadel, Michael, Jared, and Noah's therapist.

Kadel testified about the three unsigned agreements during limited case management and her belief that Jared was not negotiating in good faith. In her view, Jared's position throughout her involvement in the case was that visitation in some form

was best for Noah; he simply disputed how and when visits should occur. Echoing the findings in her report, Kadel said Michael had a substantial relationship with Noah and visitation was in Noah's best interest. Kadel acknowledged she never interviewed Noah or reviewed his medical records. She thought the parties understood Noah's medical issues and were not disputing them.

Michael's testimony covered several topics. He discussed his and Nancy's relationship with Noah, Jared's reasons for stopping visitation, Noah's anger issues, and the shower and window incidents. Michael also mentioned he and Nancy had arranged for Susan to come visit family in Wichita for a few days in March 2018. Although Michael and Nancy thought not having contact with Susan was not good for Noah, they avoided discussing her in front of Noah at Jared's request. Michael and Nancy never mentioned Susan's upcoming trip to see Noah, but he found out about it. Michael said the only way Noah would have found out was from Jared.

Michael said he had a substantial relationship with Noah and believed continued visitation was in Noah's best interests. Michael asked the district court to adopt Kadel's recommendations but was willing to follow any visitation conditions, including therapeutic visits or family counseling. The parties had been seeing a family counselor since October 2018, though Noah only went a few times and Jared had missed some recent sessions. Michael thought Jared's position in the case, which he viewed as unreasonable, was to allow no visitation.

Jared discussed Noah's anger issues at length. Jared said certain topics trigger Noah's outbursts. The best way to respond is to give Noah space to cool down and then help him understand why he acted inappropriately. Jared thought Michael and Nancy were not following that approach and were activating some of Noah's trigger topics, like his mother. Jared was concerned when Susan told him she would be in town—the trip Michael and Nancy had arranged—and wanted to see Noah. Susan never contacted Noah

7

during the trip, but Noah found out about it from his therapist without Jared's knowledge or permission.

Jared asked the district court to adopt the visitation plan he submitted pretrial. The plan said Noah should receive weekly individual counseling and "engage in therapeutic visitation with [Michael] by a competent provider to monitor interactions." Beyond that, additional visits would occur only if approved by a therapist. During his testimony, Jared agreed with some of Kadel's recommendations but thought they would only work along with supervised visits with a therapist. Jared was not asking for all visitation to end; he viewed supervised visits as a long-term solution that would allow a counselor to improve Michael's interactions with Noah. Jared's proposal was based on recommendations from Noah's therapist, Jennifer Primeaux.

Primeaux is a licensed counselor who offers mostly individual therapy for adults and children. Including the first appointment on April 2, 2019, Primeaux had seen Noah seven times. After consulting with Noah's psychiatrist, Primeaux diagnosed him with bipolar disorder one, attention deficit hyperactivity disorder, a mild intellectual disability, and oppositional defiant disorder. Because of that last disorder, Noah gets angry when certain trigger topics are mentioned and will do the opposite of what he is told to do. Primeaux thought Noah's comfortability with therapy was improving but his anger issues were not.

Primeaux discussed her visitation recommendations. Rather than continuing family therapy, she recommended therapeutic visitation. Michael and Noah would have supervised visits with Michael's therapist and another therapist for Noah. The therapists would "coordinate care and find out if this would be an appropriate means to bridge the gap between them." Primeaux does not provide therapeutic visitation but could refer the parties to someone who does.

8

*The district court's findings*

The district court announced its oral findings the day after trial. It found Michael had a substantial relationship with Noah, a point undisputed by the parties, and Jared to be a fit parent. The district court then focused on whether visitation was in Noah's best interests. It gave special weight to Jared's views on this point as he was a fit parent and had sole custody of Noah. Jared's position, the district court explained, was not to end all visitation but to allow supervised visits with a therapist. But rather than order therapeutic visitation, which the district court "expect[ed] [would] occur[,]" the district court took the view that "Dad . . . is in the best position to make that determination" of when it was ok for Noah to visit Michael. When Michael's attorney sought clarification of the order, the district court reiterated it was not ordering any visitation:

> "Again, I'm not making grandparent visitation orders in this case. I'm declining to do so. I have discretion to do so, and I'm declining to make orders. I think Dad is a fit parent. He's making a best interest determination. Dad has indicated that he believes it's in his best interest to establish visitation through therapy, and I'm not going to substitute our judgment or make an order one way or the other, based on that.

> "I believe he will do so. If that becomes a problem down the road, certainly, we may be back here. But, again, other issues are going to arise, or other issues may arise that complicate therapy. I don't know what it is.

> "The bottom line is, I have found Dad to be fit. I have found Dad to be capable of making best interest determinations. Dad is doing so. And I'm not going to make orders in this case, as requested."

The district court also awarded attorney fees to Jared, noting that under K.S.A. 2019 Supp. 23-3304, Jared should receive fees unless "justice and equity" require awarding Michael fees. Although Jared had not followed some court orders, the district court still awarded him fees because he was a single parent of an "extremely difficult

child" and Michael had not respected his parenting decisions throughout the case. Jared owed $773.25 to his previous attorney (the one who had moved to dismiss Nancy from the case) and $3,055.50 to his current attorney.

The district court entered a written journal entry a few days later that reflected its oral findings. Michael now appeals the district court's refusal to order visitation and its decision to award Jared attorney fees.

I.    DID THE DISTRICT COURT ERR BY FAILING TO ORDER GRANDPARENT VISITATION?

Michael challenges the district court's decision to deny him grandparent visitation rights. To obtain visitation, Michael had to prove two things: (1) a substantial relationship existed between Noah and him; and (2) visitation was in Noah's best interests. See K.S.A. 2019 Supp. 23-3301(b). Because fit parents presumably act in their children's best interests, the district court had to give Jared's views on grandparent visitation special weight if he was a fit parent. See *Kansas Dept. of SRS v. Paillet*, 270 Kan. 646, Syl. ¶ 7, 16 P.3d 962 (2001). But the fit-parent presumption is not absolute: Michael could rebut it with evidence that Jared's position as a fit parent was unreasonable. See *Paternity of M.V. v. T.R.*, 56 Kan. App. 2d 28, Syl. ¶ 4, 422 P.3d 1178 (2018).

On both elements, we review the district court's factual findings for substantial evidence. Substantial evidence is evidence, when viewed in the light most favorable to the prevailing party below, sufficient to support the district court's decision. *Paillet*, 270 Kan. at 653. We accept as true all evidence and reasonable inferences drawn from the evidence that supports the district court's findings and disregard any conflicting evidence and inferences. We do not reweigh the evidence or reassess witness credibility. *Gannon v. State*, 309 Kan. 1185, 1192, 443 P.3d 294 (2019).

Michael disputes the district court's findings on the second element. He claims the district court erred by failing to make a finding that Jared's position on visitation was reasonable. Michael does not challenge the district court's finding that Jared is a fit parent, and he recognizes the district court had to apply the fit-parent presumption and give special weight to Jared's position on visitation. He argues the district court could only do so if Jared's view on grandparent visitation was reasonable. Because the district court never found Jared's position on visitation to be reasonable, Michael argues the district court could not defer to Jared's view. We disagree.

First, Michael's argument wrongly emphasizes the unreasonableness of Jared's litigation actions instead of focusing on the reasonableness of Jared's position on grandparent visitation. Michael's brief lists a litany of Jared's allegedly unreasonable actions, from refusing to comply with mediation orders to not signing three limited-case-management proposals after orally agreeing to them. But our focus must be on whether Jared's actual position on grandparent visitation is reasonable in light of Noah's best interests when considering the totality of the circumstances. See *In re Cathey*, 38 Kan. App. 2d 368, 376, 165 P.3d 310 (2007). Thus, even if Jared's conduct during litigation had been unreasonable at times, it is the reasonableness of Jared's position on grandparent visitation that controls.

Second, Michael's argument appears to require the district court to have uttered the magic words of declaring Jared's position on grandparent visitation to be reasonable. It is true the district court never made the explicit finding that Jared's position was reasonable, but it did so implicitly. The district court found Jared's proposal—supervised visits with a therapist—best served Noah's interests. A plain reading of its oral findings shows the district court thought therapeutic visitation was reasonable and Michael was not properly handling Noah's outbursts during visits. The district court thought supervised visits could help improve Michael's visits with Noah. The record shows the district court found Jared's proposal of therapeutic visitation to be reasonable.

11

Third, substantial evidence supported a finding that Jared's position on grandparent visitation was reasonable. Jared testified the best way to respond to Noah's outbursts was to stay calm, giving Noah the time and space to cool off. Once Noah calmed down, Jared could help Noah understand why his actions were wrong. But Jared said Michael was not following that approach. Jared thought therapeutic visits were a long-term solution that would allow a counselor to monitor Michael's interactions with Noah and better respond to his outbursts. This evidence supported a finding that Jared's plan for grandparent visitation was reasonable and in Noah's best interests.

Finally, we turn to the essence of Michael's argument, namely that the district court erred in failing to order any visitation instead of ordering visitation consistent with Jared's proposal of therapeutic supervision. Our court has previously stated: "Absent findings of unreasonableness, a trial court should adopt the grandparent visitation plan proposed by a fit parent." *In re T.A.*, 30 Kan. App. 2d 30, 35, 38 P.3d 140 (2001). Because the district court failed to do this, we must agree with Michael that the district court erred.

Jared agreed visitation should continue in some form. He said so in his pretrial proposal, which requested therapeutic visits followed by unsupervised visits at the therapist's recommendation. At trial, he asked the district court to adopt his pretrial proposal to help Michael better respond to Noah's outbursts. And his lawyer left no doubt on the issue in closing arguments: "[W]e would ask that you follow our . . . grandparenting plan and make a finding regarding that." Thus, Jared's position on grandparent visitation, as a fit parent, was for therapeutic visitation.

That is how the district court understood Jared's position, too. In its oral findings the district court described Jared's view on visitation as "revolv[ing] around therapeutic visits, getting everybody in counseling, on the same page" and with "a counselor . . . help[ing] out with when and where and how visitation should occur." These statements

12

show the district court thought Jared had decided therapeutic visitation was in Noah's best interest.

Yet the district court stopped short of implementing that decision. Rather than order therapeutic visits as Jared requested, the district court instead declined to make any order on visitation, hoping that therapeutic visits would occur. In one breath, the district court found "[Jared] is recommending that, [visitation] occur through therapeutic visitation, and I expect that will occur." In the next, it said it was "not going to order grandparent visitation at this time." When Michael's attorney asked the district court to clarify whether it was ordering any visitation, it reiterated Jared's position that therapeutic visits were best for Noah. But the district court would not "substitute [its] judgment or make an order one way or the other" on therapeutic visits. It simply "expect[ed]" and "believe[d]" Jared would allow those visits.

The problem with the district court's decision to refuse to order any visitation and leave visits to the discretion of Jared is it denies Michael's rights to grandparent visitation once the requisite findings contained in the statute have been met. Our court has stated that parental discretion in these matters cannot be "absolute; otherwise the parent could arbitrarily deny grandparent visitation without the grandparents having any recourse." 30 Kan. App. 2d at 34. The district court found Michael enjoys a substantial relationship with Noah and that Noah's best interest is served by grandparent visitation. It also implicitly found Jared's proposal for grandparent visitation in a therapeutic setting to be reasonable. Given these findings and given Jared's previous actions of cutting off visitation at various points in time thus spawning this litigation, we must conclude the district court abused its discretion by failing to order grandparent visitation consistent with Jared's proposal. See, generally, *In re Marriage of Kimbrell*, 34 Kan. App. 2d 413, 419, 119 P.3d 684 (2005) (district court's judgment regarding visitation not to be disturbed absent an abuse of discretion).

13

II. DID THE DISTRICT COURT ABUSE ITS DISCRETION IN AWARDING ATTORNEY FEES TO JARED?

Michael also argues the district court erred in awarding Jared attorney fees.

A district court may award attorney fees only if authorized by statute or agreement between the parties. When authorized by statute, the amount of fees awarded is within the district court's discretion. The district court abuses its discretion if it commits legal or factual error or if no reasonable person would agree with its decision. *Snider v. American Family Mut. Ins. Co.*, 297 Kan. 157, 162, 169, 298 P.3d 1120 (2013).

In visitation cases like this one, a statute provides that "attorney fees shall be awarded to the respondent . . . unless the court determines that justice and equity otherwise require." K.S.A. 2019 Supp. 23-3304. Jared is the respondent to the motion here, so the district court had to award him attorney fees unless justice and equity required awarding them to Michael. On appeal, Michael must show the district court abused its discretion in not finding that justice and equity required awarding fees to him. Michael alleges no legal or factual error, so he must show that no reasonable person would agree with the district court's decision to award Jared fees.

Michael argues it was unreasonable to award Jared attorney fees given his litigation conduct. In Michael's view, Jared unreasonably increased attorney fees by moving to dismiss Nancy as a party in the case, refusing to pay for court-ordered mediation, not following a temporary visitation order, and not signing visitation plans after orally agreeing to them. And the whole reason attorneys got involved in the first place, Michael maintains, is because Jared abruptly cut off visitation. To support his argument, Michael cites two cases, neither of which shows the district court's decision was unreasonable.

In the first case, *DeGraeve v. Holm*, 30 Kan. App. 2d 865, 50 P.3d 509 (2002), a panel upheld the denial of an award of attorney fees to a mother who denied grandparent visitation for vindictive purposes. The mother's vindictiveness, the panel held, supported the district court's decision to deny her attorney fees under the predecessor to K.S.A. 23-3304. 30 Kan. App. 2d at 869. Michael analogizes his case to *DeGraeve* because both involved the abrupt termination of visitation. But *DeGraeve* relied on the mother's vindictiveness in denying visitation, not how quickly she ended visitation. Even if Jared had ended visits abruptly, that act would support a decision to award Michael fees only if Jared did so vindictively. Michael makes no vindictiveness argument, so *DeGraeve* adds little to his position.

The second case Michael cites, *In re Cathey*, is unusual because the panel was fractured and produced several separate opinions. Judge Marquardt wrote a majority opinion on the first issue (visitation rights) and a dissenting opinion on the second issue (attorney fees). Judge Green wrote for the majority on the fee issue, joined in a separate concurrence by Judge Malone. 38 Kan. App. 2d at 377-79. Both the majority and dissent focused their attorney fee analysis on who was responsible for increasing litigation costs. For the majority, it was the grandparents. 38 Kan. App. 2d at 379; for the dissent, the father. 38 Kan. App. 2d at 378-79.

*Cathey* teaches that reasonable people can disagree on who was responsible for increased litigation costs. A reasonable person might look at the evidence here and adopt Michael's view—Jared drove up litigation costs by ending visitation, ignoring court orders, and not negotiating in good faith. But a reasonable person could view the facts as the district court did, attributing Jared's litigation conduct to his strained relationship with his father. The district court found Jared interpreted court orders as coming from his father, who had not been respecting Jared's parenting decisions. And the district court found Jared was doing the best he could as a single parent of a child with behavioral disorders. We conclude a reasonable person could agree with the district court under

15

these circumstances that justice and equity did not require awarding attorney fees to Michael. The district court did not abuse its discretion in awarding fees to Jared.

The district court's judgment refusing to order grandparent visitation is reversed, and the case is remanded for further proceedings consistent with this opinion. The district court's award of attorney fees to Jared is affirmed.

Affirmed in part, reversed in part, and remanded with directions.